FOURTH DIVISION

December 30, 2004

1-03-1008

THE PEOPLE OF THE STATE OF ILLINOIS,
 ) Appeal from the

  ) Circuit Court of

Plaintiff-Appellee,
  ) Cook County. 

  )

v.  ) 

  )

ANTHONY POWELL,  )  Honorable

  )  Colleen McSweeney-Moore,

Defendant-Appellant.  ) Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

Defendant Anthony Powell and three codefendants were charged with six counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2000)), in connection with the shooting death of Mitchell Dotson, a rival gang member.  At trial, defendant testified he shot the victim in self-defense.  The jury, rejecting defendant's self-defense claim, convicted him of first degree murder committed while personally discharging a firearm.  The circuit court sentenced defendant to consecutive terms of 30 years for first degree murder and 20 years for personally discharging a firearm during the commission of the murder pursuant to Illinois' "15/20/25-to-life" mandatory sentencing enhancement provision (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000)).  On appeal, defendant argues (1) the 20-year sentence enhancement violates both the proportionality and due process clauses of the Illinois Constitution and (2) his trial counsel was ineffective for failing to request that the circuit court inquire about potential gang bias amongst the venire members.  For the following reasons, 

we affirm defendant's conviction and sentence.

   BACKGROUND

At trial, James Taylor testified that, at approximately 11 p.m. on July 12, 2000, he was standing on the corner of Lockwood and North Avenues in Chicago with Phillip Bell, a man named "Mane," and the victim.  He saw defendant standing with several people by a car that was parked on the other side of the street.  Taylor testified that as defendant and the victim walked across the street towards one another, the victim asked defendant, "[W]hat's up?"  Defendant answered, "This is what up," pulled a gun from his waistband, and shot the victim.  Taylor testified that he did not see the victim with a gun or reach for his waist as he and defendant met in the middle of the street.  

Samantha Miller testified that, at approximately 10 p.m. on July 12, 2000, she and her four-year-old son were at the apartment of Tierra Minor, located near the corner of North and Lockwood Avenues.  After leaving the apartment, she saw a group of men, including defendant, standing around the car of her boyfriend, Terrell Pearson.  Miller denied telling the police that she saw a gun under defendant's shirt or that she saw defendant walk across the street towards another group of men, pull a "big gun" from his waistband, and shoot the victim.  She testified that she never saw the victim reach for his waist or into his pockets before being shot.  She further testified that she heard gunshots that night, but she did not remember where the shots came from.  When she heard the shots, she grabbed her son and ran into a friend's house to call a cab.  She then went to Ieshia Richardson's home.  

In January 2001, Miller spoke with Assistant State's Attorney Joe Cataldo (ASA Cataldo) and gave a signed statement.  She testified that she signed the statement only because she was scared and did not want "them to take [her] son away from [her]."  In her statement, Miller told ASA Cataldo that both defendant and Pearson were in the same gang; she could tell that defendant had a gun under his shirt; defendant walked toward the group of men across the street with his hand under his shirt and asked, "What do you want?"; the victim walked toward defendant while the other three men backed away; defendant pulled a "big gun" out from under his shirt, pointed it at the victim, and shot him; she saw no one other than defendant with a gun; and she never saw the victim reach for his waist or into his pockets before he was shot.  She testified, however, that she made up everything in her statement and that she had not really seen anything that night.

ASA Cataldo testified that on January 29, 2001, he went to Area Five police headquarters and took a statement from Ms. Miller concerning what she had seen on the night of the shooting.  In her statement, Miller told ASA Cataldo that she saw defendant walk up to the victim, pull a "big gun" from his waistband, and shoot the victim in the chest.  She stated that she did not see anyone other than defendant with a gun, the victim did not reach for his waistband or pockets before being shot, and the victim "was just standing there doing nothing when [defendant] shot him."  

Aishe Minor testified that, on July 12, 2000, she was babysitting Ms. Miller's son with her sister, Tierra Minor, at her sister's apartment.  At approximately 10 p.m., Ms. Miller and Mr. Pearson arrived to pick up her son.  After they picked up her son and left the apartment, Pearson came back upstairs and said he needed to make a phone call.  About 15 to 20 minutes after making that phone call, someone rang the doorbell and Miller and Pearson left.  Minor testified that she too left and, when she went outside, she saw a group of men, including defendant, standing on one side of the street and another group of men standing on the other side.  After seeing defendant standing by Pearson's car, she started walking back to her apartment.  She then heard someone say something to defendant, which was followed by gunshots.  When she heard the gunshots, she ran into the apartment.

Ieshia Richardson testified that she received a phone call from Pearson between 10 p.m. and 11 p.m. on July 12, 2000.  Pearson told her to find defendant and codefendant Jeremy Jackson and have them come and pick him up at Minor's apartment because "he had his baby and some people were sitting on him."  After she found defendant and Jackson near the corner of Potomac and Lavergne Avenues and told them what Pearson had told her, the men left.         

After Detective Demosthenes Balodinas testified about his observations of the crime scene and the evidence he recovered during his investigation, the State recalled ASA Cataldo.  ASA Cataldo testified that he spoke with defendant around 1:40 a.m. on January 30, 2001.  After he spoke with defendant for about an hour, defendant chose to give a videotaped statement.  In his statement, defendant explained that the victim's gang had been "giving [him] a problem selling drugs at Lavergne and Potomac" and that he was angry about this.  He stated that the day before the shooting, he was told first by a member of the victim's gang, and then later by the victim himself, that he could not sell drugs on that corner.  Angry at being kicked off the corner, defendant went home thinking he was "gonna hurt somebody." 

Later, defendant went back to the corner of Lavergne and Potomac.  The victim approached him again and told him to leave the area or he would hurt him.  Defendant left and walked to Lavergne and Crystal.  After telling a fellow gang member what the victim had told him, they went to the house of a man known as "Mae Mae" to discuss the situation.  They decided there that they were going to shoot someone.

The next day, while defendant was selling drugs on the corner of Lavergne and Crystal, Ieshia Richardson approached him and said that Pearson was at her sister's apartment and that the victim and members of his gang were standing on the corner across the street.  After going to Mae Mae's house to get some guns, defendant and Jackson went to North and Lockwood.  As they walked, defendant checked to make sure that the gun was loaded and put it under his shirt.  When he got to North and Lockwood, he saw the victim standing across the street with a few other men he recognized as members of the victim's gang.  He did not see them holding any weapons.  After the victim approached him and asked him "What you on?" defendant pulled out his gun and shot the victim in the chest.  Defendant then stood over the victim and started pulling the trigger, but his gun jammed.  Defendant stated that he was "pissed" his gun jammed because he wanted to "shoot [the victim] some more" and then "shoot the rest of them."  Defendant then ran back to Mae Mae's house.  

After the State rested, defendant testified on his own behalf.  Defendant testified that he was a member of the Four Corner Hustlers.  He stated that the victim was a "five star supreme leader" of the Mafia Insane Vice Lord Nation.  He testified that he first saw the victim a couple of days before the shooting driving in a car with two other men.  As defendant was standing on the corner of Potomac and Lavergne selling drugs, the victim drove up to him and said, "Shorty, get off this corner before I hurt you."  Defendant testified that the victim had a "little shotgun" in his lap.  Defendant then left the corner.

A few hours later, while defendant was standing on the corner of Kamerling and Potomac with a few of his friends, the victim drove by again, pointing at defendant and shaking his head. 

On the evening of July 12, 2000, while defendant was again selling drugs on the corner of Potomac and Lavergne, Ieshia Richardson came up to him and told him that members of the Mafia Insane Vice Lords gang had surrounded Pearson in her sister's apartment on North and Lockwood.  Hearing this, defendant and codefendant Jackson obtained guns and went to escort Pearson safely from the apartment.  When they arrived at the apartment, defendant saw a group of Mafia Insane Vice Lords standing across the street.  The victim asked defendant, "What you on?"  Pearson told the victim, "[D]on't ask Shorty what he's on."  Defendant testified that the victim then started to walk towards defendant with his hand under his shirt.  Defendant testified that it looked like the victim was reaching for a gun, but he admitted that he never actually saw a gun.  Not wanting to wait and see, defendant shot the victim because he "was scared" and feared for his life.  Defendant testified that he believed the victim was going to kill him based upon the victim's reputation for hurting people and the victim's earlier threats.  After the victim fell, defendant kept pulling the trigger, but his gun jammed.  Defendant then ran to Mae Mae's house.

Defendant admitted to making the videotaped statement.  He testified that he did not tell the police or ASA Cataldo that he shot the victim in self-defense because he was not asked.  On cross-examination, defendant testified that he was angry at all the Mafia Insane Vice Lords gang members on that corner and that he wanted to shoot all of them.

After closing arguments, the jury rejected defendant's self-defense theory and found him guilty of first degree murder.  The circuit court sentenced defendant to 30 years for first degree murder.  The court added 20 years, to be served consecutively, because the jury found that defendant, in committing first degree murder, had personally discharged a firearm.  This court granted defendant's motion to file a late notice of appeal.

ANALYSIS

I.  CONSTITUTIONALITY OF ILLINOIS' "15/20/25-TO-LIFE" STATUTE

Defendant was charged, 
inter
 
alia
, with first degree murder during the commission of which he personally discharged a firearm.  See 720 ILCS 5/9-1(a)(1) (West 2000).  After the jury convicted defendant of first degree murder, the trial court sentenced him to 30 years' imprisonment for first degree murder.  The circuit court then added 20 years to defendant's sentence pursuant to Illinois's "15/20/25-to-life" mandatory sentencing enhancement provision, which states, in pertinent part, "if, during the commission [of first degree murder], the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court."  730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000).
(footnote: 1)  
Defendant argues that this 20-year enhancement violated both the proportionality and due process clauses of the Illinois Constitution.

 A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity.  
People v. Malchow
, 193 Ill. 2d 413, 418, 793 N.E.2d 433 (2000).  A court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it can reasonably be done.  
Malchow
, 193 Ill. 2d at 418.  The question of whether a statute is constitutional is subject to 
de
 
novo
 review.  
People v. Carney
, 196 Ill. 2d 518, 526, 752 N.E.2d 1137 (2001).

A.  Proportionality

Defendant first argues that the addition of 20 years to his sentence under Illinois's "15/20/25-to-life" mandatory sentencing enhancement provision violated the proportionate penalties clause of the Illinois Constitution.  Specifically, defendant contends that the provision punishes a less serious crime (first degree murder committed while personally discharging a firearm) more severely than similar offenses that constitute greater threats to the health and safety of the public (aggravated battery with a firearm and aggravated discharge of a firearm).

The State contends that it is inappropriate to conduct a proportionality analysis here because the legislative purposes behind the offenses of first degree murder while personally discharging a firearm, aggravated battery with a firearm, and aggravated discharge of a firearm differ.  The State also argues that, even if the purposes behind these statutes are the same, the enhancement provision does not violate the proportionality clause because first degree murder while personally discharging a firearm is not just a more serious offense than either aggravated battery with a firearm or aggravated discharge of a firearm, it is "the most serious crime committed in society."

The proportionate penalties clause of the Illinois Constitution provides that "all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, §11.  Our supreme court has recognized three situations in which this clause is violated: (1) where the punishment for a particular offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more harshly; and (3) where identical offenses are given different sentences.  
People v. Davis
, 177 Ill. 2d 495, 503-04, 687 N.E.2d 24 (1997).

In this case, defendant challenges the enhancement provision under the second test only; a test commonly referred to as the "cross-comparison analysis."  See 
People v. Arnold
, 349 Ill. App. 3d 668, 675, 812 N.E.2d 696, 702 (2004).  Under the cross-comparison analysis, the court must determine (1) whether the statutory purposes of the compared offenses are similar and (2) whether the offense with the harsher penalty is more serious than the offense with the less severe penalty.  
People v. Lombardi
, 184 Ill. 2d 462, 475-76, 705 N.E.2d 91 (1998).  Thus, the first inquiry here is whether the offenses defendant proffers for cross-comparison have a similar statutory purpose.  

In 
Lombardi
, our supreme court was asked to conduct a cross-comparison analysis amongst the offenses of armed violence, aggravated battery with a firearm, and aggravated criminal sexual assault.  
Lombardi
, 184 Ill. 2d at 477-81.  The court found such analysis was inappropriate because the purpose behind each offense differed.  
Lombardi
, 184 Ill. 2d at 478. Specifically, the court stated:

"Generally, the problem targeted by the armed violence statute is the risk of harm associated with the presence of a weapon during the commission of a felony.  When the felony underlying a charge of armed violence is possession of a controlled substance, the particular evil addressed by the legislature is the danger connected with the presence of a weapon during this type of felony.  By contrast, the purpose of the aggravated battery with a firearm statute is to discourage individuals from inflicting injury by knowingly discharging a firearm. [Citation.] Unlike 

the armed violence statute, the aggravated battery with 

a firearm statute is not intended to deter the use of weapons other than firearms and is not specifically 

aimed at conduct committed during another felony."  
 Lombardi
, 184 Ill. 2d at 478-79.

The court concluded, "[g]iven that the purposes of these statutes are distinct, a comparative proportionality analysis is not appropriate."  
Lombardi
, 184 Ill. 2d at 479.  The court noted that its decision (1) was consistent with its prior decisions, (2) afforded the legislature the "necessary deference" in performing its constitutional duty of determining the appropriate penalty for the offenses that it defines, and (3) avoided potentially violating separation of powers principles by making the difficult decision about which offense was more serious, thereby trampling on the legislature's historic role in determining both "crime" and "punishment" for the society which has elected it and over which it governs.  See 
Lombardi
, 184 Ill. 2d at 480.

In 
People v. Walden
, 199 Ill. 2d 392, 395, 769 N.E.2d 928 (2002), our supreme court was asked to compare the statutory purposes behind the 15-year "armed with a firearm" enhancement to the offenses of armed robbery and armed violence predicated upon aggravated robbery.  In reviewing the legislative history behind the offense of armed robbery while in possession of a firearm, as well as its prior cases dealing with the purpose behind the armed violence statute, the court found that the two offenses clearly "[shared] a common statutory purpose."  
Walden
, 199 Ill. 2d at 396.  According to the court, the "identical statutory purpose" that these two offenses shared was "to deter the use of firearms in the commission of felonies."  
Walden
, 199 Ill. 2d at 396.  Finding that these two statutes shared the same purpose, the court held that the 15-year enhancement to the defendant's sentence for armed robbery violated the proportionate penalties clause of the Illinois Constitution because it punished the less serious crime of armed robbery while in possession of a firearm more severely than the more serious crime of armed violence predicated upon aggravated robbery.  See 
Walden
, 199 Ill. 2d at 396-97.

In 
People v. Moss
, 206 Ill. 2d 503, 520-33, 795 N.E.2d 208 (2003), the supreme court was again asked to undertake a cross-comparison analysis, this time comparing the 15-   and 20-year enhancements to sentences for armed robbery, aggravated kidnapping, and aggravated vehicular hijacking to the unenhanced sentences for aggravated battery with a firearm and aggravated discharge of a firearm.  The court, citing its decision in 
Walden
, concluded that the "issue regarding the first stage of a cross-comparison analysis has already been decided."  
Moss
, 206 Ill. 2d at 525.  The supreme court found that the purpose behind each statute was "to deter the use of firearms in the commission of felonies" and, therefore, "the circuit court correctly concluded that the statutes carrying the 15- and 20-year enhancements had a similar purpose to the statutes for aggravated battery with a firearm and aggravated discharge of a firearm."  
Moss
, 206 Ill. 2d at 525-26.  There seems to be an inconsistency, however, amongst the "statutory purpose" holdings in 
Lombardi
, 
Walden
, and 
Moss
.  

In 
Walden
, the court found that the purposes behind the offenses of armed robbery while in possession of a firearm and armed violence were "identical."  
Walden
, 199 Ill. 2d at 396.  In 
Lombardi
, the court found that the statutory purposes behind the offenses of armed violence and aggravated battery with a firearm were "distinct," making cross-comparison analysis inappropriate.  
Lombardi
, 184 Ill. 2d at 478-79.  In 
Moss
, the court found, despite its holding in 
Lombardi
, that the purposes behind the firearm enhancement provisions 
and aggravated battery with a firearm were similar enough to engage in a cross-comparison analysis.  
Moss
, 206 Ill. 2d at 526.  If the purpose behind the 15-year enhancement for possession of a firearm during the commission of a felony is "identical" to the purpose of the armed violence statute, and the purpose of the armed violence statute is "distinct" from the purpose behind the aggravated battery with a firearm statute, how can the purpose behind the 15 or 20-year enhancement for possession or discharge of a firearm while committing a felony be the same or similar enough to the purpose behind the aggravated battery of a firearm statute to warrant cross-comparison analysis?  As the ancient syllogism goes:

    If A (15-year enhancement) = B (armed violence)

    And B (armed violence) ≠ C (aggravated battery with a firearm)

    Then A (15-year enhancement) ≠ C (aggravated battery with a firearm). 

Though the intent of the firearm enhancements is to punish the use of a firearm, they do so only in connection with the commission of another felony, be it armed robbery, aggravated kidnapping, or first degree murder.  See 720 ILCS 5/18-2, 10-2, 18-4, 730 ILCS 5/5-8-1(a)(1)(d)(I) through (a)(1)(d)(iii)(West 2000).  On the other hand, the offenses of aggravated battery with a firearm and aggravated discharge of a firearm (which also seek to deter the use of firearms) are "not specifically aimed at conduct committed during another felony."  
Lombardi
, 184 Ill. 2d at 478 (stating that the statutory purpose behind aggravated battery with a firearm is "to discourage individuals from inflicting injury by knowingly discharging a firearm"). 
 

The problem, it seems, is how to define the "common statutory purpose" for each offense that is proffered for cross-comparison analysis.  If that purpose is permitted to be defined broadly, as it is under a single-subject analysis for instance (see 
People v. Burdunice
, 211 Ill. 2d 264, 269, 811 N.E.2d 678 (2004) (stating that "criminal law" qualifies as a legitimate single subject for a statute)), then all criminal statutes will qualify for cross-comparison analysis.  By merely arguing that the purpose behind each offense is "the prevention of crime," a defendant could offer any offense for cross-comparison, 
i.e
., comparing first degree murder (720 ILCS 5/9-1 (West 2000)) to theft or lost or mislaid property (720 ILCS 5/16-2 (West 2000)).  This, of course, would lead to both absurd results and a waste of judicial resources for, not only would the first step of the cross-comparison test become meaningless, but the deference owed to the legislature in determining what conduct to criminalize and establishing the appropriate punishment for that conduct would be eviscerated.  See 
Lombardi
, 184 Ill. 2d at 476 (explaining that "with respect to offenses that are enacted for "different purposes, we presume that the legislature considered different factors in establishing the penalties for them, and we defer to [that legislative] judgment"); see also 
Moss
, 206 Ill. 2d at 523; 
Walden
, 199 Ill. 2d at 395
.  

If, on the other hand, "common statutory purpose" is defined too narrowly, then just the opposite will occur: few crimes will be amenable to proportionality analysis.  For instance, an argument could be made that the purposes behind aggravated battery with a firearm and aggravated discharge of a firearm differ because, while both offenses criminalize conduct committed through the use of a firearm, only the former criminalizes conduct that results in physical injury to a victim; the latter's purpose is arguably only to deter an individual from alarming another by shooting at or near that person.  See 720 ILCS 5/12-4.2 (West 2000) (aggravated battery with a firearm); 720 ILCS 5/24-1.2 (West 2000) (aggravated discharge of a firearm). 

We need not determine here whether the offenses proffered by defendant share a common statutory purpose.  Even assuming, 
arguendo
, that the offenses defendant proffers here have similar purposes, it cannot be seriously argued that the crime of first degree murder while personally discharging a firearm is a less serious threat to the public health and safety than either aggravated battery with a firearm or aggravated discharge of a firearm.  In analyzing this second prong of the cross-comparison analysis; 

"The determination of whether a particular offense is more serious than another is not limited to an examination of the degree of harm inflicted.  While that is a relevant consideration, the legislature may consider other factors, such as the frequency of the crime and the high risk of bodily harm associated with it.  Also, the legislature may perceive a need to enact a more stringent penalty provision to halt an increase in the commission of a particular crime.  As an institution, the legislature is better equipped than the judiciary to identify and remedy the evils confronting our society and is more capable of gauging the seriousness of an offense.  Therefore, courts will generally defer to the legislature's conclusion that a particular offense is more serious than another."  
People v. Moore
, 343 Ill. App. 3d 331, 345, 797 N.E.2d 217 (2003).

Not only, as the State points out, is murder in a class by itself, as opposed to aggravated battery with a firearm (Class X) or aggravated discharge of a firearm (Class 1), this Court recently characterized the seriousness of first degree murder while personally discharging a firearm:

"[W]e note that while murder has been characterized as 'the most serious offense[]' [citations], murder while discharging a firearm, as in this case, is more egregious in terms of the seriousness of the offense solely because there is an unparalleled and heightened danger that results from an offender's discharge of a firearm."  
Arnold
, 349 Ill. App. 3d at 676.

Though courts have found that the "15/20/25-to-life" sentence enhancement provision violated the proportionality clause when applied to offenses other than first degree murder, (see 
Moss
, 206 Ill. 2d at 531 (finding enhancement unconstitutional when applied to armed robbery and aggravated vehicular hijacking); 
People v. Morgan
, 203 Ill. 2d 470, 491-92, 786 N.E.2d 994 (2003) (finding enhancement unconstitutional when applied to attempted first degree murder); 
Walden
, 199 Ill. 2d at 396-97 (15-year enhancement added to armed robbery conviction unconstitutional); 
People v. Garcia
, 199 Ill. 2d 401, 770 N.E.2d 208 (2002) (same); 
People v. Dryden
, 349 Ill. App. 3d 115, 811 N.E.2d 302 (2004) (15-year enhancement to home invasion violates proportionate penalties clause)), no court has found the enhancement unconstitutional when applied to first degree murder (see 
People v. Zapata
, 347 Ill. App. 3d 956, 968-72, 808 N.E.2d 1064 (2004) (finding the 20-year enhancement for personally discharging a firearm during the commission of first degree murder was constitutional); 
Arnold
, 349 Ill. App. 3d at 673-676 (same); 
Moore
, 343 Ill. App. 3d at 343-47 (upholding constitutionality of the 25-year enhancement for personally discharging a firearm that proximately caused great bodily harm or death during the commission of first degree murder); 
People v. Sawczenko-Dub
, 345 Ill. App. 3d 522, 526-33, 803 N.E.2d 62 (2003) (same); 
People v. Tolbert
, No. 1-02-3514, slip op. at 18 (October 29, 2004) (same)).  

Defendant relies heavily upon the supreme court's holding in 
Moss
 to support his argument that the 20-year enhancement is unconstitutional because it punishes a less serious crime more severely.  In 
Moss
, the supreme court compared the danger of "armed robbery with personal discharge of a firearm, aggravated kidnapping with personal discharge of a firearm, and aggravated vehicular hijacking with personal discharge of a firearm" (which the court referred to collectively as the "Public Act 91-404 offenses") to "aggravated battery with a firearm" and "aggravated discharge of a firearm."  
Moss
, 206 Ill. 2d at 523-25.  The supreme court affirmed the circuit court's order finding both the 15- and 20-year enhancements to be unconstitutional, holding that both aggravated battery with a firearm and aggravated discharge of a firearm were more serious because the Public Act 91-404 offenses "require only that the firearm be discharged, not that it be discharged in the direction of a person."  
Moss
, 206 Ill. 2d at 529.  The court rejected the State's argument that the circuit court placed too much emphasis on the "degree of harm caused by the respective offenses," stating:

"Moreover, in making its determination as to the relative seriousness of the offenses, the circuit court considered not only the degree of harm but the risk of bodily harm as well.  For example, in comparing aggravated discharge of a firearm with the Public Act 91-404 offenses involving personal discharge of a firearm, the circuit court noted that the former offense focuses on 'the intentional firing of a weapon 
at or in the direction of individuals
' (emphasis added), while the latter offenses require only that the firearm be discharged, not that it be discharged in the direction of a person.  The risk of bodily harm clearly is greater where an offense involves the discharge of a firearm 
at someone
, than it is where the offense merely requires the discharge of a firearm.  Thus, it was not only the degree of harm that the circuit court considered in determining the seriousness of these offenses; the court also considered the high risk of bodily harm."  (Emphasis in the original.)  
Moss
, 206 Ill. 2d at 529-30.

The court found that the 15- and 20-year enhancements to convictions for armed robbery, aggravated kidnapping, and aggravated vehicular hijacking violated the proportionality clause because the more serious offenses of aggravated battery with a firearm and aggravated discharge of a firearm were punished less severely.  See 
Moss
, 206 Ill. 2d at 530-31.  Turning its attention to the 25-years-to-life enhancement, the supreme court adopted the finding of the circuit court that "the 25-years-to-life enhancement for causing great bodily harm, permanent disability, permanent disfigurement, or death" was not disproportionate.  
Moss
, 206 Ill. 2d at 532. 
 Moss
 does not support defendant's argument for two reasons.

First, the court in 
Moss
 limited its decision to instances where the enhancements were applied to convictions for armed robbery, aggravated kidnapping, and aggravated vehicular hijacking.  See 
Moss
, 206 Ill. 2d at 531.  Specifically, the court noted:

"We conclude, as did the circuit court below, that the less serious conduct proscribed in the Public Act 91-404 offenses involving possession of a firearm (15-year add-on) and personal discharge of a firearm (20-year add-on) is punished more harshly than is the more serious conduct targeted by the statutes for aggravated battery with a firearm and aggravated discharge of a firearm.  Accordingly, 
with regard to the statutes for armed robbery (720 ILCS 5/18-2 (West 2000)), aggravated kidnapping (720 ILCS 5/10-2 (West 2000)), and aggravated vehicular hijacking (720 ILCS 5/18-4 (West 2000)), 
the 15- and 20- year add-ons mandated by Public Act 91-404 violate the
 
proportionate penalties clause of the Illinois Constitution. (Emphasis added.) 
Moss
, 206 Ill. 2d at 531.

In this case, because defendant was charged and convicted of personally discharging a firearm during the commission of the offense of first degree murder (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000)), the court's holding in 
Moss
 is not dispositive.

 Second, the court's reasoning in 
Moss
 concerning the seriousness of the 15- and 20-year enhancements for committing an offense while armed with or personally discharging a firearm is not applicable here.  In 
Moss
, the supreme court found that aggravated battery with a firearm and aggravated discharge of a firearm were more serious than the Public Act 91-404 offenses because the former offenses required that the defendant either actually shoot or shoot at an individual.  See 
Moss
, 206 Ill. 2d at 528-29.  On the other hand, the "personal discharge of a firearm" enhancement required "only that the firearm be discharged, not that it be discharged in the direction of a person."  
Moss
, 206 Ill. 2d at 529.  One could imagine scenarios where an armed robber enters a bank with a gun in his pocket, triggering the 15-year add-on (see 720 ILCS 5/18-2(a)(1), (b) (West 2000)), or shoots into the air, thereby qualifying for the 20-year enhancement (see 720 ILCS 5/18-2(a)(3), (b) (West 2000)).  The supreme court held that because the discharge of the firearm did not have to be directed at an individual to qualify for the 20-year enhancement, both the degree and risk of harm were less serious than that found in the offenses of aggravated battery with a firearm or aggravated discharge of a firearm.  See 
Moss
, 206 Ill. 2d at 529.

In this case, it is true that the mere discharge of the firearm during the commission of the charged offense qualified defendant for the 20-year enhancement.  However, the offense for which defendant was charged here was murder in the first degree, and his act of discharging a firearm was committed during the commission of that murder.  Unlike those cases where the 15- or 20-year enhancement was applied to offenses where harm to an individual is neither an element of nor inherent in the charged offense, it is impossible to qualify for either the 15-, 20-, or 25-to-life enhancement under section 5-8-1(a) of the Unified Code of Corrections without the victim having been murdered.  See 730 ILCS 5/5-8-1(a)(1)(d)(I) through (a)(1)(d)(iii) (West 2000).  In fact, the very basis for 
Moss
' holding that the 25-years-to-life enhancement as applied to offenses like armed robbery, aggravated kidnapping, and aggravated vehicular hijacking did not violate the proportionality clause is equally applicable to our holding that the 15-, 20-, and 25-years-to-life enhancements to first degree murder are constitutional: serious harm to the victim is required for those enhancements to apply.

We recognize that, in those cases which have upheld the constitutionality of the 20-year enhancement for personally discharging a firearm during the commission of the offense of first degree murder, the defendant did not raise the same offenses for cross-comparison that defendant raises here.  

In 
Arnold
, the defendant argued "that the less serious offense of murder based on a theory of accountability while personally discharging a firearm, even if the offender causes no harm to the victim, is given a harsher punishment than the more serious conduct of personally inflicting the fatal wounds by means other than a firearm."  
Arnold
, 349 Ill. App. 3d at 675.    The appellate court rejected this argument, quoting the holding in 
Moore
:

"'Comparative proportionality review is inappropriate here because the new firearms provisions of the first-degree murder sentencing statute serve a second, more specific purpose and target a unique type of danger that is absent when the offender does not possess a firearm.  See 
Hill
, 199 Ill. 2d at 458.'" 
Arnold
, 349 Ill. App. 3d at 676, quoting 
Moore
, 343 Ill. App. 3d at 346. 

Following the reasoning in 
Moore
, the court held "murder while discharging a firearm, as in this case, is more egregious in terms of the seriousness of the offense solely because there is an unparalleled and heightened danger that results from an offender's discharge of a firearm."  
Arnold
, 349 Ill. App. 3d at 676. 

In 
Zapata
, the defendant argued that the 20-year enhancement for personally discharging a firearm during the commission of first degree murder was disproportionate to the penalty for murder by other means.  
Zapata
, 347 Ill. App. 3d at 968.  In rejecting this argument, this court considered the "unique, pervasive and enhanced danger created by an offender's possession of a firearm."  Specifically, this court noted: 

"[A] firearm gives a perpetrator a strong advantage over the victim; effectively deters the victim's escape; is particularly lethal to the victim of the underlying crime as well as others in the vicinity; allows the perpetrator to effortlessly and instantaneously execute an intent to kill once it is formed; and allows an offender to harm a greater number of victims more rapidly than other weapons and inflict deadly wounds on a number of people within a wide area and within a short amount of time.  [Citation.]  

In short, the issue is not whether it is a more serious offense to discharge a firearm during a murder than to murder by other means.  Rather, the threshold issue is whether deterring the carrying or use of a firearm during a murder is a purpose more specific and distinct from that of the general murder statute.  Following 
Hill, Moore
, and 
Sawczenko-Dub
, this court concludes that the legislative purpose of deterring a person's use of firearms when the person is committing an offense is a more specific and distinct purpose that applies even in murder cases, based on the unique, pervasive and enhanced danger that results from an offender's possession of a firearm.  Accordingly, comparative proportionality review is inappropriate in this case." 
Zapata
, 347 Ill. App. 3d at 971.

The 
Zapata
 and 
Arnold
 courts relied on the first prong of the cross-comparison analysis, holding that the purposes of the compared statutes are distinct.  In doing so, those courts considered the supreme court's holding in 
Moss
 and held that 
Moss
 did not provide a basis upon which to find the 20-year enhancement unconstitutional.  See 
Zapata
, 347 Ill. App. 3d at 968; 
Arnold
, 349 Ill. App. 3d at 675.  Even if we were to agree with defendant that the purposes of the statutes compared in this case are the same or related, we would next have to consider whether the offense with the harsher penalty is more serious than the offense with the less severe penalty.  See 
Moss
, 206 Ill. 2d at 523; 
Hill
, 199 Ill. 2d at 454; 
Zapata
, 347 Ill. App. 3d at 969; 
Arnold
, 349 Ill. App. 3d at 675. 

First degree murder committed while personally discharging a firearm carries a sentence of 40 to 80 years in prison.  See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000)).  By contrast, aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1), (b) (West 2000)), a Class X felony, carries a penalty of 6 to 30 years imprisonment (730 ILCS 5/5-8-1(a)(3) (West 2000)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2), (b) (West 2000)), a Class 1 felony, carries a range of 4 to 15 years (730 ILCS 5/5-8-1(a)(4) (West 2000)).  However, as stated above, because both aggravated battery with a firearm and aggravated discharge of a firearm constitute a less serious threat to the public health and safety, first degree murder while personally discharging a firearm is rightly punished more severely, for though the former offenses might seriously injure or unnerve the victim, the latter ends the victim's life.  Consequently, because defendant has failed to satisfy the second prong of the cross-comparison analysis test, the 20-year enhancement mandated under the first degree murder sentencing statute (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002)) does not violate the proportionality clause of the Illinois Constitution.

B.  Due Process

Defendant next argues that the mandatory 20-year enhancement violates his right to due process because "it is not a reasonable method to accomplish the statute's objective since the statute punishes the risk of harm more severely than the actual harm that it is meant to prevent."  Though defendant concedes that the purpose behind the enhancement is proper, 
i.e.
, to deter the use of a firearm in the commission of an offense (see 
Morgan
, 203 Ill. 2d at 488), he argues that the enhancement is an unreasonable means to achieve that purpose because the 20-year mandatory add-on is equivalent to the minimum sentence for first degree murder.  He contends that "the add-on punishes the 
risk
 of harm, that is, the risk associated with the discharge of a firearm, equally to, or more severely than the 
actual
 harm caused-the murder itself."

The due process clause of the Illinois Constitution mandates that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."  Ill. Const. 1970, art. I, §2.  Where an individual challenges the validity of a statute that does not affect a fundamental right, its compliance with substantive due process requirements is determined under the rational basis test.  
People v. Wright
, 194 Ill. 2d 1, 24, 740 N.E.2d 775 (2000).  Under the rational basis test, a statute is upheld where it "'bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective.'" 
Wright
, 194 Ill. 2d at 24, quoting 
People v. Adams
, 144 Ill. 2d 381, 390, 581 N.E.2d 637 (1991).  In the context of a challenge to a criminal statute, we note that the legislature has wide discretion in establishing penalties for criminal offenses.  
People v. Marin
, 342 Ill. App. 3d 716, 722, 795 N.E.2d 953 (2003).  

Defendant argues that the method employed by the statute is unreasonable.  Two divisions of this court, however, have rejected due process attacks to the 20-year mandatory enhancement for first degree murder while personally discharging a firearm.  See 
Arnold
, 349 Ill. App. 3d at 676 (rejecting the defendant's due process argument that the statute "punishes less culpable conduct more severely"); 
Zapata
, 347 Ill. App. 3d at 972 (rejecting the defendant's argument that "the enhancement is not reasonably related to the evil that the legislature deemed to be a greater threat to the public," 
i.e.
, murder with a gun).  Defendant has not offered any reason why this court should not follow the decisions in 
Arnold
 and 
Zapata
.  Therefore, because first degree murder with a gun is "more egregious [than murder by other means] in terms of the seriousness of the offense solely because there is an unparalleled and heightened danger that results from an offender's discharge of a firearm" (
Arnold
, 349 Ill. App. 3d at 676), and due to the deference accorded to the legislature in fashioning penalties for criminal offenses (
Marin
, 342 Ill. App. 3d at 722), we find that the 20-year enhancement is a reasonable means of accomplishing the goal of deterring gun violence and, thus, does not violate due process.

II.  INEFFECTIVE ASSISTANCE DURING 
VOIR DIRE

Defendant next argues that his trial counsel was ineffective for failing "to request that the trial court question veniremembers about possible gang bias."  Defendant, relying heavily on 
People v. Strain
, 194 Ill. 2d 467, 742 N.E.2d 315 (2000), contends that the "evidence and argument at trial were permeated by references to" gangs, "[d]efense counsel in this case knew that gang evidence would be pivotal both to the State's case and to [defendant's] defense," and "[d]efense counsel thus prejudiced [defendant] by allowing a jury to be formed with no 'informed and intelligent basis on which to assert challenges for cause or to exercise peremptory challenges.'"  

Ineffective assistance of counsel is established when a defendant shows that: (1) his counsel's representation fell below an objective standard of reasonableness and (2) counsel's error prejudiced the defendant in that but for counsel's shortcomings, the outcome of the proceeding would have been different.  
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); 
People v. Albanese
, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984).  The fundamental concern underlying this test is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  
Strickland
, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.  Defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not incompetence.  
People v. Coleman
, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998).  The prejudice prong of the 
Strickland
 test requires "a reasonable probability of a different result, not merely a possibility."  
People v. Gacy
, 125 Ill. 2d 117, 129-30, 530 N.E.2d 1340 (1988).  Moreover, "[t]he decision as to whether to question a potential jurors on a particular subject is considered to be one of trial strategy, which has no bearing on the competency of counsel."  
People v. Furdge
, 332 Ill. App. 3d 1019, 1026, 774 N.E.2d 415 (2002), citing 
People v. Palmer
, 188 Ill. App. 3d 414, 428, 545 N.E.2d 743 (1989).

The exact argument advanced here by defendant was rejected by this court in both 
Furdge
, 332 Ill. App. 3d at 1026-27, and 
People v. Benford
, 349 Ill. App. 3d 721,733-34, 812 N.E.2d 714, 724-25 (2004).  In 
Furdge
, the court stated:

"We note that in this case, both the victim *** and the defendant were gang members.  It is reasonable that defense counsel as a matter of trial strategy concluded that questioning the venire about bias against gangs would serve no purpose since both the victim and defendant were similarly situated.  Here, where the gang evidence was limited to explain motive and the victim was also a gang member, defense counsel could have reasonably concluded as a matter of trial strategy that his questioning, which could serve to unduly emphasize the gang issue, outweighed any potential prejudice a venire member may have had.  Moreover, defense counsel could have reasonably concluded that any prejudice against gang members would have also operated against the State, since its victim and only eyewitness was an admitted gang member."  
Furdge
, 332 Ill. App. 3d at 1026.  

This reasoning was followed by the court in 
Benford
.  After quoting much of the above paragraph, the court in 
Benford 
held:

"Defendant does not allege that any juror displayed a potential gang bias and dismisses the fact that the jurors each agreed that they could decide the case fairly.  Where defendant cannot overcome the presumption that counsel's decision was trial strategy (here, to avoid overemphasizing gang membership), his ineffectiveness of counsel claim fails."  
Benford
, 349 Ill. App. 3d at 733-34. 

In this case, while defendant was an admitted gang member, so too were the victim and the State's main eyewitness, James Taylor.  Just as in 
Furdge
, defendant's trial counsel "could have reasonably concluded that any prejudice against gang members would have also operated against the State."  
Furdge
, 332 Ill. App. 3d at 1026.    

Furthermore, though gang evidence permeated the trial, both sides chose to utilize it.  While the State used this evidence to show defendant's motive for shooting the victim, defense counsel relied upon it to support defendant's self-defense claim.  Specifically, defendant testified that the victim had threatened him on at least two prior occasions for selling drugs on his gang's turf and that the victim had a reputation for violence.  Defendant, therefore, needed this evidence to support his self-defense theory and it is reasonable to assume that defense counsel made the conscious decision not to request that the trial court question the venire regarding possible gang bias; a decision that, based upon the proffered theory of defense, was a matter of sound trial strategy.  See 
Benford
, 349 Ill. App. 3d at 734; 
Furdge
, 332 Ill. App. 3d at 1026-27; 
see also 
People v. Williams
, 295 Ill. App. 3d 456, 469, 692 N.E.2d 723 (1998) (finding no ineffective assistance where defense counsel did not tender supplemental 
voir
 
dire
 questions because "it is plausible that defense counsel chose not to tender supplemental questions in order to avoid having a jury that might place more credence in the State's occurrence witnesses, as most of them were gang members").

Finally, though the jurors were not asked specifically about their opinion on gangs and gang members, each juror told the court that he or she would be able to decide the case fairly by applying the law provided by the court to the facts presented by the parties.  Thus, defendant has failed to establish that his trial counsel was ineffective.  See 
Benford
, 349 Ill. App. 3d at 733-34; 
Furdge
, 332 Ill. App. 3d at 1027.

Defendant relies upon 
People v. Strain
, 194 Ill. 2d 467 (2000), to support his argument that his trial counsel was ineffective for failing to request that the trial court question the venire about any potential gang bias.  In 
Strain
, the supreme court held that, based upon its "inherent power to make rules governing the practice in the circuit courts, including the regulation of jury trials in criminal cases," as well as the "strong prejudice against street gangs" that may be present amongst jurors, "particularly in metropolitan areas," the trial court abused its discretion when it refused the defense's request to probe the venire members for potential gang bias.  
Strain
, 194 Ill. 2d 475-81.  After noting that the defendant had "sought to expose juror predisposition toward, and bias against, gangs," the court held: 

"The trial court was required to conduct 
voir
 
dire
 in a manner to assure the selection of an impartial panel of jurors, free from bias and prejudice.  Because of the trial court's refusal to probe for gang bias, defendant was denied an informed and intelligent basis on which to assert challenges for cause or to exercise peremptory challenges."  
Strain
, 194 Ill. 2d at 480-81.

Defendant's reliance upon 
Strain
 is misplaced for three reasons.

First, the issue in 
Strain
 was not whether defense counsel was ineffective for failing to request that the trial court question the venire regarding gang bias but, rather, whether the trial court abused its discretion when it refused the defense's request to question the venire about gang bias, a distinction noted in both 
Benford
 and 
Furdge
.  See 
Benford
, 349 Ill. App. 3d at 733 n.4; 
Furdge
, 332 Ill. App. 3d at 1026-27.

Second, the victim in 
Strain
 was an innocent bystander, caught in the middle of gang retaliation.  See 
Strain
, 194 Ill. 2d at 473.  Here, the victim was a rival gang member.  Any bias the jurors might have had against gangs would have worked against both defendant and the State. 

Third, unlike the defendant in 
Strain
, here, defendant chose to utilize gang evidence to explain and support his self-defense theory.  Without his testimony explaining why the victim had threatened him before the shooting, as well as his state-of-mind testimony concerning the victim's propensity for violence, the shooting would have appeared to be simply a random act of violence.  Though gang evidence provided the State with motive, it also supported defendant's theory of self-defense.

Therefore, defense counsel was not ineffective for failing to request that the circuit court question the venire regarding potential gang bias.

Affirmed.

REID, P.J. concurs.

JUSTICE THEIS specially concurring:

I concur in the result reached by the majority, but write separately because I do not join in that portion of the majority opinion which addresses the proportionality of the 20-year mandatory sentencing enhancement provision for first-degree murder.  730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000).  

Defendant has no standing to raise this issue.  Courts will not consider the validity of a statutory provision unless the person challenging the provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid. 
 
People v. Morgan
, 203 Ill. 2d 470, 482, 786 N.E.2d 994, 1002 (2003).
  In either case, a party has standing to bring a constitutional challenge only if the party is able to show himself to be within the class 
aggrieved
 by the alleged unconstitutionality.
  
Morgan
, 203 Ill.2d at 482, 786 N.E.2d at 1002. (Emphasis added).  A defendant does not ordinarily have standing to challenge a statute as it might be applied to others in different circumstances.  
People v. Falbe
,
 189 Ill. 2d 635, 644, 727 N.E.2d 200 (2000); 
In re M.T.
, 352 Ill. App. 3d 131,139, 816 N.E.2d 354, 362 (2004). 

Essentially, defendant contends that the enhancement for personally discharging a firearm during the commission of a murder is penalized more severely than aggravated discharge of a firearm which he maintains is "
substantially less culpable activity."
  Specifically, he argues, citing 
Moss
, that under the 20-year enhancement, no actual harm or injury need result from the discharge.  Therefore, the enhancement is less serious than the offense of aggravated discharge of a firearm which requires that the firearm be discharged in the direction of another person, an action which poses a greater risk.  Defendant is correct that hypothetically, there may be cases in which a defendant commits murder by the use of a weapon other than a firearm or by accountability, but is eligible for the 15 or 20 year enhancement because he carried or discharged a firearm and no person was injured by the firearm.  Thus, in certain circumstances, the enhancement may apply without establishing that the discharge caused serious harm to the victim where the victim was murdered by other means.  

The problem with this logic is that defendant cannot show himself to be within the class aggrieved by this hypothetical.  In the present case, actual harm did indeed result from the discharge of his firearm.  The facts established by defendant’s own confession and testimony reveal that he pulled out a gun and shot the victim in the chest, resulting in the victim’s death.  Where the discharge of the firearm resulted in death, defendant has no basis to argue that the enhancement, as applied to him, was less serious than the aggravated discharge of a firearm in which there is merely a risk of harm or injury.  Rather, as the majority points out, defendant was actually eligible for the 25-to-life mandatory enhancement pursuant to section 5-8-1(a)(1)(d)(iii) because he personally discharged a firearm that proximately caused death to another person.  730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2000).  Had the jury been provided with the appropriate jury instruction, the 25-to-life enhancement would have been mandatory.  730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2000).

Furthermore, defendant has not argued, nor can he argue, that the 20-year enhancement is facially invalid.  The fact that a statute may be invalid under some circumstances is insufficient to establish facial invalidity; a statute is facially unconstitutional only if " '
no
 set of circumstances exists under which the Act would be valid.' "  
In re C.E.
,
 161 Ill.2d 200, 210-11, 641 N.E.2d 345 (1994), quoting 
United States v. Salerno
,
 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed.2d 697, 707 (1987).  Therefore, as long as there exists a situation in which a statute could be validly applied, a facial challenge must fail.  
Hill v. Cowan
, 202 Ill. 2d 151, 157, 781 N.E.2d 1065, 1069 (2002).  We have already held in 
Arnold
, 812 N.E.2d at 701-04, that there does exist at least one situation in which the statute could be validly applied.  Thus, where defendant lacks standing to raise the issue on appeal, I would not address the merits of his argument.

Accordingly, I concur in the result of the majority in affirming defendant’s conviction and sentence. 

       

FOOTNOTES
1:
Under the "15/20/25-to-life" provision, a defendant's sentence is enhanced if he utilizes a firearm while committing the offense of first degree murder.  See 730 ILCS 5/5-8-1(a)(1)(d)(I) through (a)(1)(d)(iii)(West 2000).  If the defendant either was "armed with a firearm" or "personally discharged a firearm" while committing first degree murder, the circuit court must add 15 or 20 years to his sentence, respectively.  See 730 ILCS 5/5-8-1(a)(1)(d)(I), (a)(1)(d)(ii)(West 2000).  If, however, he "personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court."  730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2000).  

Defendant in this case was charged under all three of these sections, but the jury was instructed only as to the "personally discharged" 20-year add-on provision.  The record does not indicate what happened to the other two counts or why the jury was not instructed as to the count alleging that defendant personally discharged a firearm that proximately caused death to another person.  We note this because defendant's confession and testimony provided evidentiary support for this count.